Peterson, Justice.
*362 These companion appeals raise questions about when a jury considering a medical malpractice case might also be instructed on issues of ordinary negligence. Sterling Brown Sr. sued the defendants individually and on behalf of his wife, Gwendolyn Lynette Brown, after she suffered catastrophic brain damage, allegedly from oxygen deprivation while undergoing a procedure to relieve back pain. Mrs. Brown died while this suit was pending, and the complaint was amended to add a wrongful death claim.[1] A trial in which the court instructed the jury on both ordinary negligence and medical malpractice resulted in an award of nearly $22 million. A divided Court of Appeals affirmed. We granted the defendants' petitions for certiorari to consider their argument that the Court of Appeals erred by concluding that the evidence supported a claim of ordinary negligence.
The plaintiffs' case of medical malpractice was very strong. But a very strong case of medical malpractice does not become a case of ordinary negligence simply due to the egregiousness of the medical malpractice. The Court of Appeals erred in concluding that an ordinary negligence instruction was authorized by evidence that a doctor defendant responded inadequately to medical data provided by certain medical equipment during a medical procedure. Because the verdict was a general one such that we cannot determine that the jury did not rely on this erroneous theory of liability, we reverse with instructions that the Court of Appeals on remand order a full retrial as to the appellants.
1. Background and procedural history
a. Background
The evidence presented at trial was as follows. Dr. Dennis Doherty, an anesthesiologist *363 and pain management specialist, began treating Gwendolyn Lynette Brown for chronic back pain in 2008. Dr. Doherty performed two epidural steroid injection procedures ("ESIs")[2] on Mrs. Brown without incident. On September 16, 2008, Mrs. Brown arrived at the surgery center that Dr. Doherty had opened in 2006 ("the Surgery Center") for a third ESI. After her vital signs were assessed, Mrs. Brown was given a pain reliever and a sedative and placed face down on a surgical table. Some time later, at about 5:30 p.m., Dr. Doherty came into the operating room, administered propofol (another, different sedative), and started the procedure. Mrs. Brown's blood oxygen saturation level at this point was recorded at 100 percent.[3]
Shortly after Dr. Doherty began the procedure, the pulse oximeter[4] that was used to monitor Mrs. Brown's blood oxygen saturation level sounded an alarm, indicating a drop in the level of oxygen in her blood. Michelle Perkins, a surgical technician involved in the procedure, at several points tried to turn up the oxygen, but each time Dr. Doherty told her to return to the imaging machine she had been operating. Ann Yearian, a nurse who was assisting, testified that at Dr. Doherty's direction she turned up the oxygen being administered to Mrs. Brown. Yearian began performing a "jaw thrust"-a procedure to open a patient's airway by repositioning her jaw. But Yearian reported difficulty, so Dr. Doherty paused his work of administering the epidural and assisted with the jaw thrust. Perkins asked Dr. Doherty if she should call nursing director Mary Hardwick, but he told her not to, saying Mrs. Brown was breathing and her airway was good. Perkins nonetheless tried to summon Hardwick with a surreptitious text message.
When Hardwick arrived, Mrs. Brown was lying face down on the table with five-inch needles in her back, Dr. Doherty was at the head of the table holding her jaw to maintain an airway, and the pulse oximeter was sounding an alarm and registering zero.[5] The blood pressure monitor was recycling, inflating repeatedly without registering a reading. Hardwick grabbed a stretcher so that Mrs. Brown could be turned on her back to be resuscitated, but Dr. Doherty would not allow it. Instead, he told Hardwick that the pulse oximeter was malfunctioning and did not show Mrs. Brown's true oxygen saturation, and that Mrs. Brown had a pulse, was breathing, and was fine. Perkins retrieved a second pulse oximeter at Hardwick's directive and Hardwick placed it on Mrs. Brown's toe, but it also registered a reading of zero oxygen saturation. Dr. Doherty continued to insist that everything was fine and resumed the procedure as various staffers attempted to physically maintain Mrs. Brown's airway. The procedure was completed at 5:48 p.m, 18 minutes after it began.
After Dr. Doherty completed the procedure and the needles were removed, Mrs. Brown was turned onto her back and placed on a stretcher. A pulse oximeter began registering a blood oxygen level in the low 50-percent range. Mrs. Brown was given drugs to reverse the effects of some of the drugs she had been given previously. Dr. Doherty began manually ventilating Mrs. Brown with a bag valve mask. Within a couple of minutes, her oxygen levels rose to the 90s; she was able to maintain that level with oxygen being administered. Hardwick asked if she could call 911, but Dr. Doherty told her not to, saying that Mrs. Brown was just heavily sedated.
At about 7:30 p.m., when Mrs. Brown had not fully awoken or responded normally to voice or painful stimuli, she was taken to a *364 hospital by emergency medical personnel. Dr. Doherty told Mrs. Brown's daughter-in-law, the emergency medical technicians who responded to the practice's 911 call, and the physician who admitted Mrs. Brown to the hospital that the ESI had gone fine and Mrs. Brown simply was having complications coming out of the anesthesia slowly; he gave no indication that Mrs. Brown might have experienced respiratory complications during the procedure. Mrs. Brown arrived at the hospital in what the admitting physician described as "acute respiratory failure." Mrs. Brown remained profoundly cognitively impaired and a quadriplegic for six years until her death in September 2014. The plaintiffs presented evidence that Mrs. Brown had suffered a catastrophic brain injury caused by oxygen deprivation during the ESI and that she died from complications of that injury.
b. Trial proceedings
The plaintiffs sued Dr. Doherty, Hardwick, Southeastern Pain Ambulatory Surgery Center, LLC ("the LLC"), and Southeastern Pain Specialists, P.C. ("the P.C.").[6] The complaint and subsequent amendment were entitled "Complaint for Medical Malpractice," but proposed pre-trial orders filed by the parties framed the plaintiffs' allegations as including both medical malpractice and ordinary negligence. The plaintiffs at various points raised several possible theories of liability, including that Dr. Doherty improperly administered propofol to Mrs. Brown-an obese patient with sleep apnea -without positioning another anesthesiologist or a nurse anesthetist at the head of the table to monitor her airway; that Dr. Doherty failed to respond appropriately when Mrs. Brown experienced respiratory distress; and that Dr. Doherty failed to contact emergency medical services promptly. Among other things, the plaintiffs also alleged that Hardwick knew that Doherty was impaired by a condition that interfered with his ability to practice medicine and that Hardwick failed to warn patients about his impairment or otherwise intervene to protect them from harm.[7]
At the January 2015 trial, the court charged the jury on both ordinary negligence and medical malpractice. Arguing for the ordinary negligence instruction, the plaintiffs' counsel cited the "obvious[ ]" obligation "to save the patient if they're not breathing" and misrepresentations that Dr. Doherty made to other healthcare providers. The defendants objected to the charge on ordinary negligence, arguing among other things that it was not warranted by the evidence.
Anticipating those instructions in closing, the plaintiffs argued to the jury:
Now, look, this case is a case of negligence, right? Neglect. And negligence the judge will tell you ... is the failure to use
care that is ordinarily used by ordinarily careful persons. You just have to use care under the circumstances presented, not under the circumstances of the first two procedures, but the circumstances presented when Gwen wasn't breathing or wasn't exchanging oxygen as she was supposed to.
... When you boil it down, did they use care that's ordinarily used by careful people and the skills required of a doctor or a nurse? ... [W]e've all heard it before in other types of cases. The doctors and the nurses must use a reasonable degree of care and skill as is ordinarily employed under similar circumstances. [The judge will] actually say, I think, "under like and similar circumstances." So you have to judge the case on what the circumstances were on September 16th, 2008, not what some people say the circumstances were in this courtroom when they're in trial and they changed their testimony. ... [I]t is the circumstances the judge will tell you that are so important in this case when you determine whether reasonable skill and care was used by the doctor and by Nurse Hardwick and by the corporations that employed them.
*365 The trial was split into three phases, with the jury to consider liability and compensatory damages during Phase I, the availability of punitive damages during Phase II, and the amount of any punitive damages during Phase III. The trial court generally forbade the plaintiffs from introducing during Phase I any evidence regarding Dr. Doherty's alleged impairment and behavioral issues outside of his treatment of Mrs. Brown, unless the defendants or defense witnesses opened the door through their testimony. At the conclusion of Phase I, the jury found Hardwick not liable but otherwise found for the plaintiffs with an award of nearly $22 million, apportioning fault 50 percent to Dr. Doherty, 30 percent to the LLC, and 20 percent to the P.C. At the conclusion of Phase II, the jury found that the circumstances warranted punitive damages against Dr. Doherty, but during Phase III, the jury awarded no punitive damages.
c. Appellate proceedings
The defendants appealed, raising various arguments. The Court of Appeals affirmed, finding over the dissent of three judges that the trial court did not err in charging the jury on ordinary negligence or in denying Dr. Doherty's motion for directed verdict on the ordinary negligence claims. See Doherty v. Brown, 339 Ga. App. 567, 572-573 (1)-(2), 794 S.E.2d 217 (2016). The majority concluded that a jury could have found ordinary negligence based on Dr. Doherty's insufficient response to the readings of the two pulse oximeters and blood pressure monitor, as well as his failure to inform emergency responders and hospital staff about Mrs. Brown's possible oxygen deprivation in the operating room:
A layperson would not need an expert to convey the implication of two pulse oximeters with readings of zero percent oxygen, or of a blood pressure monitor that continually recycles without registering a blood pressure. A layperson would also understand, without the guidance of expert testimony, that the emergency technicians and medical staff at the hospital where Mrs. Brown was taken by ambulance should have been fully and truthfully informed about the incident in the operating room that indicated a hypoxic event.
Id. at 572 (1), 794 S.E.2d 217. All three remaining defendants petitioned for certiorari. We granted the petitions to determine (1) whether the trial court's instruction on ordinary negligence was appropriate in the light of the evidence; and (2) if it was not, whether that error was harmful as to each defendant.
2. Analysis
We conclude that the Court of Appeals erred in deciding that whether and how to respond to medical data from medical devices during a medical procedure does not require medical judgment. Accordingly, the trial court erred to the extent that it instructed the jury on ordinary negligence based on this theory. Because the jury returned a general verdict and we thus cannot determine whether the jury relied on this erroneous theory or not, we do not consider whether the plaintiffs' alternative theory of ordinary negligence-that Dr. Doherty made misrepresentations to other providers-supported an ordinary negligence charge. Rather, we conclude that the ordinary negligence charge was harmful to the defendants and order a retrial.
a. The Court of Appeals erred in concluding that an ordinary negligence instruction was authorized by evidence that a doctor defendant responded inadequately to medical data provided by certain medical equipment during a medical procedure.
A judge presiding over a civil trial should charge the jury on only the legal issues raised by the complaint and answer, adjusted to the evidence introduced at trial. See Ga. Power Co. v. Kalman Floor Co., 256 Ga. 534, 535, 350 S.E.2d 421 (1986). Whether the negligence alleged by a plaintiff is ordinary negligence or professional malpractice is a question of law for the court. See Dent v. Memorial Hosp. of Adel, 270 Ga. 316, 318, 509 S.E.2d 908 (1998). And it is a question of law whether evidence is sufficient to support the giving of a particular charge; the evidence required is only slight evidence. See Morris v. State, 301 Ga. 702, 705 (2), 804 S.E.2d 42 (2017) ; see also *366 Safeway Ins. Co. v. Hanks, 323 Ga. App. 728, 730-731 (2), 747 S.E.2d 890 (2013) ("[A] charge may be given when there is slight evidence to sustain it." (citation and punctuation omitted) ).
Medical providers owe certain duties of ordinary care to their patients, and a breach of one of those duties is ordinary negligence, not medical malpractice. See Lamb v. Candler Gen. Hosp., Inc., 262 Ga. 70, 71 (1), 413 S.E.2d 720 (1992) (failure to properly replace disposable parts in ophthalmic instrument created issue of simple negligence for which no expert affidavit was required under OCGA § 9-11-9.1 (a) ); Dent, 270 Ga. at 318, 509 S.E.2d 908 (instruction that required defense verdict if jury found no professional negligence was erroneous given evidence nurses failed to comply with doctor's orders and failed to ensure that crash cart was equipped for pediatric patients). "[M]edical malpractice exists only where the act or omission by a professional requires the exercise of expert medical judgment." Lamb, 262 Ga. at 71 (1), 413 S.E.2d 720 (citation and punctuation omitted). If the alleged negligent act or omission does not require the exercise of medical judgment, the alleged tortfeasor's possession of professional medical credentials does not make the case one of medical malpractice. Id. In order to prove medical malpractice, a plaintiff generally must present testimony from an expert witness to overcome the presumption that the provider acted with due care and establish the provider's negligence. See Beach v. Lipham, 276 Ga. 302, 303-304 (1), 578 S.E.2d 402 (2003).
Here, the Court of Appeals erred by concluding that the trial court correctly charged the jury on ordinary negligence because a lay person would not need any expert testimony to understand (1) the meaning of data provided by the pulse oximeters and blood pressure monitor used in Mrs. Brown's care and (2) how best to respond to that information in the midst of a medical procedure. Without citation to the record, the plaintiffs imply that lay persons know how to use pulse oximeters because they may be purchased without a prescription at common drug stores. But you can buy a lot of things at drug stores; the ability of the public to purchase a medical device is not evidence of general lay knowledge regarding how to interpret and act upon readings provided by that device, much less in the middle of a medical procedure.
Mrs. Brown was sedated for purposes of a medical procedure involving the insertion of five-inch needles in her back when pulse oximeters alerted and a blood pressure monitor recycled continually. Whether or not the information provided by these medical devices indicated even to lay persons that Mrs. Brown was experiencing some respiratory distress, it does not follow that lay persons would know the proper response to that information in the midst of a complex medical procedure. The plaintiffs cite several Court of Appeals decisions involving the liability of lay persons such as lifeguards and swimming pool owners in the event of a drowning for the proposition that no expert knowledge is involved in determining that time is of the essence when a person is not breathing.[8] But this case does not involve a person who is clearly drowning in a pool; it involves a sedated patient showing some signs of respiratory distress in the midst of a complex medical procedure. It was error to charge the jury on ordinary negligence based on the premise that whether and how to respond to medical data from medical devices during a medical procedure does not require medical judgment.
In affirming the verdict in this case, the Court of Appeals cited Dent, in which we reversed a defense verdict based on a jury instruction that required such an outcome if the jury found no professional negligence. Dent, 270 Ga. at 317-318, 509 S.E.2d 908. Here, the Court of Appeals surmised that, as in Dent, "a jury could find, without the help of expert testimony, that certain acts and omissions associated with Mrs. Brown's injury-including ... ignoring the implications of two alarming oximeters and a recycling *367 blood pressure monitor -sounded in ordinary rather than professional malpractice." Doherty, 339 Ga. App. at 572 (1), 794 S.E.2d 217. This was error; the allegations in Dent were very different. The evidence giving rise to a claim of ordinary negligence in Dent consisted of nurses' alleged failure to follow a doctor's simple, explicit orders and alleged failure to set up a machine properly; neither alleged failure involved the exercise of medical judgment. Dent, 270 Ga. at 318-319 & n. 3, 509 S.E.2d 908. Here, there is no allegation that Dr. Doherty failed to follow the directives of a supervising provider or operate a piece of medical equipment correctly-in fact, in attempting to refute the defense contention that pulse oximeters sometimes malfunction, plaintiffs' counsel told the jury that the pulse oximeters used in Mrs. Brown's third ESI were working "just fine." Rather, the thrust of the allegation is that Dr. Doherty failed to respond appropriately-an exercise of medical judgment-to data from functioning monitors.
b. The error was harmful.
An error in the charge that injects issues not raised by the pleadings and evidence is presumed to be harmful. See Seibers v. Morris, 226 Ga. 813, 816 (3), 177 S.E.2d 705 (1970). Here, to the extent that the trial court's ordinary negligence charge permitted the jury to find the defendants liable based on the presumption that whether and how to respond to medical data from medical devices does not require medical judgment, that instruction was not warranted by the evidence. The ordinary negligence instruction invited jurors to decide the liability of the defendants without consideration of the strictures on claims for professional malpractice, such as the need for expert testimony to overcome the presumption of due care, see Beach, 276 Ga. at 303-304 (1), 578 S.E.2d 402, and the bar on finding liability based solely on hindsight, see Smith v. Finch, 285 Ga. 709, 711 (1), 681 S.E.2d 147 (2009). Although the plaintiffs correctly point out that the jury was instructed on these concepts, the trial court's vague charge that "some of the claims involve ordinary negligence and some involve medical malpractice" left the jury without guidance as to which claims were subject to which standard, and free to disregard these requirements in considering the plaintiffs' claims.[9] See Dent, 270 Ga. at 317, 509 S.E.2d 908 ("The jury can not be expected to select one part of a charge to the exclusion of another, nor to decide between conflicts therein, nor to determine whether one part cures a previous error, without having their attention specially called thereto, and being instructed accordingly." (citation omitted) ).
Plaintiffs also argue that the judgment should be affirmed simply because it was supported by the evidence. But we do not conduct such an inquiry in a case like this one. See Smith, 285 Ga. at 713 (2), 681 S.E.2d 147. Rather, when a case is submitted to a jury on both erroneous and proper bases and the jury returns a general verdict such that we cannot determine on which basis the verdict was entered, the verdict cannot stand. See Godwin v. Godwin, 265 Ga. 891, 892 (1), 463 S.E.2d 685 (1995) (reversing general verdict because case was submitted to jury with an erroneous instruction regarding a theory of recovery not supported by the evidence and we could not determine whether verdict was entered upon proper basis); Ga. Power Co. v. Busbin, 242 Ga. 612, 616-617 (8), 250 S.E.2d 442 (1978) (reversing general verdict for plaintiff where some of the theories on which the case was submitted to the jury were erroneous).
We need not consider whether the plaintiffs' claims over Dr. Doherty's communications with Mrs. Brown's subsequent healthcare providers might properly be considered under an ordinary negligence standard.[10] The trial court did not instruct the jury that it should consider only the plaintiffs' claims *368 over these communications under an ordinary negligence standard, instead giving only the vague instruction that some of the claims involved ordinary negligence and others involved medical malpractice. The trial court did not tell the jury which claims should be considered under a professional negligence standard and which claims should be considered under an ordinary negligence standard, or even give the jury a standard by which it might make that determination. And the verdict was a general one, such that we cannot determine whether the jury found the defendants liable by applying the medical malpractice standard, by applying the ordinary negligence standard to the plaintiffs' claims over Dr. Doherty's communications with subsequent health care providers, or by applying the ordinary negligence standard to the plaintiffs' claims that Dr. Doherty responded inadequately to warnings provided by certain medical equipment during Mrs. Brown's third ESI. Given that the last of three possibilities would be improper, the judgment must be reversed and the case retried regardless of how we would answer the question of whether Dr. Doherty's communications with Mrs. Brown's subsequent providers might support an ordinary negligence claim. We do not purport to do so here.
c. A full retrial is necessary, but only as to the appellants.
The parties disagree over the proper scope of any retrial. The plaintiffs argue that if we mandate the case be retried, we should reverse the Court of Appeals' decision affirming the judgment in Hardwick's favor and reverse the award of zero punitive damages. The defendants argue that the appropriate remedy is a retrial of Phase I only, with the jury's verdicts on punitive damages allowed to stand.
We decline the plaintiffs' invitation to mandate a retrial of their claims against Hardwick. The Court of Appeals did consider (and reject) the plaintiffs' argument that the trial court erred in excluding from Phase I evidence of Doherty's health and alleged impairment, which the plaintiffs contended was relevant to the liability of Hardwick and the corporate defendants. Doherty, 339 Ga. App. at 578-583 (6), 794 S.E.2d 217. But the plaintiffs did not file a cross-petition for certiorari, and Hardwick thus is not even a party before this Court. The evidentiary issue the plaintiffs seek to revisit now goes well beyond the scope of our grant of certiorari and thus was not fully briefed or argued before us. Of course, the trial court remains free to revisit its ruling as it considers the admissibility of evidence on retrial.
We do agree with the plaintiffs that a full retrial as to the remaining defendants, including their liability for punitive damages, is warranted. The plaintiffs did not file a cross-petition for certiorari challenging the Court of Appeals' determination that the trial court did not err in declining to grant a mistrial when Dr. Doherty's attorney asked a question about the availability of insurance during Phase III, and we will not entertain the plaintiffs' argument on that point now. But we nonetheless disagree with Dr. Doherty's argument that the charging error could not have affected the second and third phases and the jury's determinations during those phases are severable from its determinations from Phase I. We recognize that where the correct and erroneous portions of a judgment can be separated cleanly, we should set aside only that part that is erroneous. See Martin v. Six Flags Over Georgia II, L.P., 301 Ga. 323, 338 (III), 801 S.E.2d 24 (2017). But here the jury's decisions on punitive damages are too related to the questions of liability and compensatory damages. Whether punitive damages are available at all depends on whether liability is established, now an open question to be resolved anew on retrial. See Carter v. Progressive Mountain Ins., 295 Ga. 487, 490, 761 S.E.2d 261 (2014) ("[P]unitive damages must arise from and be based upon a compensable injury, as a claim for punitive damages has efficacy only if there is a valid claim for actual damages to which it could attach." (citation and punctuation omitted; emphasis in original) ). Morever, the proper amount of punitive damages may depend upon a number of factors, including the amount of compensatory damages awarded by the jury and the reprehensibility of the defendant's conduct. See *369 State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) ; Hosp. Auth. of Gwinnett County v. Jones, 259 Ga. 759, 764 (5) (b) n. 13, 386 S.E.2d 120 (1989), vacated by 499 U.S. 914, 111 S.Ct. 1298, 113 L.Ed.2d 234 (1991), and reinstated by 261 Ga. 613, 409 S.E.2d 501 (1991). The amount of compensatory damages, if any, to be awarded also is subject to change on retrial. Moreover, the jury on retrial may well hear a different body of evidence or rely on a different theory of liability and thus may make a different judgment as to the reprehensibility of Dr. Doherty's conduct. We thus conclude that our determination that the jury received an improper instruction on liability requires a new trial on all three phases.
Judgment reversed.
All the Justices concur, except Boggs, J., disqualified.

For simplicity, we refer to Mr. Brown and his wife's estate as "the plaintiffs."

During an ESI, steroid medication is injected into the epidural space in the spine to reduce inflammation and relieve pain.

The amount of oxygen in a patient's blood is measured as a percentage of the total amount that red blood cells can carry. Blood carries oxygen to the body's various organs, including the brain, and inadequate oxygen in the blood ultimately can lead to brain damage or death.

A pulse oximeter is a device that clips onto a patient's finger or toe and measures the patient's blood oxygen saturation level.

One of the plaintiffs' expert witnesses testified, "We like to see levels at 90 percent saturation or above."

According to a defense brief, the LLC operated the Surgery Center, and the P.C. was Dr. Doherty's professional corporation. The plaintiffs also sued Yearian and one of Dr. Doherty's physician colleagues, but both of those defendants were dismissed before trial.

Hardwick testified in her deposition that in the two years leading up to Mrs. Brown's procedure she observed Dr. Doherty exhibit various behaviors following his treatment for cancer, including sleepiness, difficulty focusing, and slurred and rambling speech.

See Walker v. Daniels, 200 Ga. App. 150, 407 S.E.2d 70 (1991) ; Ward v. City of Millen, 162 Ga. App. 148, 290 S.E.2d 342 (1982) ; Alexander v. Harnick, 142 Ga. App. 816, 237 S.E.2d 221 (1977) ; Young Men's Christian Ass'n of Metro. Atlanta v. Bailey, 107 Ga. App. 417, 130 S.E.2d 242 (1963).

Plaintiffs' counsel exacerbated the impact of this error in closing argument, suggesting to jurors that the defendants merely had to exercise care of the sort "ordinarily used by ordinarily careful persons." Further confusing the issue, counsel invited jurors to conflate the standards for ordinary and professional negligence, saying the case "boil[ed] down" to "did they use care that's ordinarily used by careful people and the skills required of a doctor or a nurse?"

We do not speculate whether this issue will recur on retrial.